UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| Erika Cromoty, | |
| *Plaintiff*, | |
| | Case No. 8:20-cv-2381 |
| v. | |
| **Midaaswi, LLC,** | Ad Damnum: **$20,000 plus Fees & Costs** |
| **Ishwaaswi, LLC,** | |
| **MoneyLion, Inc.,** | |
| **Niizhwaaswi, LLC,** | **JURY TRIAL DEMANDED** |
| **Creditserve, Inc., and** | |
| **Eric Welch,** | |
| *Defendant*s. | |

## COMPLAINT & JURY TRIAL DEMAND

COMES NOW the Plaintiff, **Erika Cromoty** ("**Ms. Cromoty**"), by and through her attorneys, Seraph Legal, P.A., and complains of the Defendants, **Midaaswi, LLC** ("**Midaaswi**"), **Ishwaaswi, LLC** ("**Ishwaaswi**"), **MoneyLion, Inc.** ("**MoneyLion**"), **Niizhwaaswi, LLC** ("**Niizhwaaswi**"), **Creditserve, Inc**. ("**Creditserve**"), and **Eric Welch** ("**Welch")** (jointly, "**Defendants**"), stating as follows:

## PRELIMINARY STATEMENT

1.      This is an action brought by Ms. Cromoty against the Defendants for violations of the *Fair Credit Reporting Act*, 15 U.S.C. § 1681, *et. seq.* ("**FCRA**").

## JURISDICTION AND VENUE

2.      Subject matter jurisdiction arises under the FCRA, 15 U.S.C. § 1681p, and 28 U.S.C. § 1331, as the FCRA is a federal statute.

3.      The Defendants are subject to the provisions of the FCRA and to the jurisdiction of this Court pursuant to Section 48.193, Florida Statutes and Fed. R. Civ. P. 4(k).

4.      Venue is proper in the Middle District of Florida, pursuant to 28 U.S.C. §1391(b)(2), because the events giving rise to this cause of action were caused by the Defendants and occurred within this District.

## PARTIES

### Ms. Cromoty

5.      **Ms. Cromoty** is a natural person residing in Tampa, Hillsborough County, Florida, and a *Consumer* as defined by the FCRA, 15 U.S.C. § 1681a(c).

### Midaaswi

6.      **Midaaswi** is a limited liability company that conducts online lending via its website, www.nationalsmallloan.com ("**National Small Loan**").

7.      Midaaswi is allegedly reachable at PO Box 632, Lac Du Flambeau, WI 54538.

8.      Midaaswi claims to be wholly owned by the LDF Tribe. **SEE PLAINTIFF'S EXHIBIT A.**

9.      Midaaswi does business in the Middle District of Florida over the internet, via text message, via Automated Clearing House transactions, and over the telephone.

### Ishwaaswi

10.     **Ishwaaswi,** is a limited liability company that conducts online lending via its website, www.radiantcash.com ("**Radiant Cash**").

11.    Ishwaaswi is allegedly reachable at PO Box 1193, Lac Du Flambeau, WI 54538.

12.    Ishwaaswi also claims to be wholly owned by the LDF Tribe. **SEE PLAINTIFF'S EXHIBIT B.**

13.    Ishwaaswi does business in the Middle District of Florida over the internet, via text message, via Automated Clearing House transactions, and over the telephone.

<u>**Niizhwaaswi**</u>

14.    **Niizhwaaswi** is a limited liability company that conducts online lending via its website, www.loanatlast.com ("**Loan At Last**").

15.    Niizhwaaswi claims to be a wholly-owned subsidiary of LDF Holdings, a holding company owned by the LDF Tribe.

16.    Niizhwaaswi conducts business in the Middle District of Florida over the internet, via text message, via Automated Clearing House transactions, and over the telephone.

<u>**MoneyLion**</u>

17.    **MoneyLion** is a Delaware corporation with a primary business address of **30 West 21st St., 9th Floor, New York, NY 10010.**

18.    The Delaware registered agent for MoneyLion is **National Registered Agents, Inc., 1209 Orange Street, Wilmington, DE 19801.**

19.     MoneyLion does business in the Middle District of Florida over the internet, via text message, via Automated Clearing House transactions, and over the telephone.

### Creditserve

20.     **Creditserve** is a California corporation with a primary business address reported as **137 N. Larchmont Blvd., Suite 705, Los Angeles, CA 90004**.

21.     Creditserve's registered agent is Christopher Chatham, **3109 W. Temple St., Los Angeles, CA 90026**.

### Welch

22.     **Welch** is a natural person, believed to reside at 137 N. Larchmont Blvd., #705, Los Angeles, CA 90004 or in the Dallas, TX area.

23.     Welch is the owner and CEO of Creditserve.

### FACTUAL ALLEGATIONS

### Usurious Loans Prohibited in Florida

24.     The State of Florida has long recognized that lending money at usurious interest rates is immoral, harmful, and contrary to public policy.

25.     Section 687.071, Florida Statutes renders the issuing of a loan with annual interest rates **greater than 45%** a felony.

26.     Section 687.071(7), Florida Statutes renders any such usurious loan unenforceable in Florida, sating "No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state."

27.     Florida's usury statutes "protect against the oppression of debtors through excessive rates of interest charged by lenders." *Sheehy v. Franchise Tax Bd.*, 84 Cal.App.4th 280, 283, 100 Cal. Rptr. 2d 760 (2000). Any person who willfully makes such a loan, in addition to criminal sanctions, forfeits the right to collect payment for the loan, as such loans are "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

### Sovereign Immunity as a Defense to State Usury Laws

28.     In an attempt to prevent prosecution under usury laws of states like Florida, non-tribal owners of online payday lending businesses frequently engage in a business model commonly referred to as a *Rent-A-Tribe* scheme.

29.     In such a scheme, non-tribal payday lenders attempt to circumvent state and federal laws which would otherwise prohibit usurious loans from being issued. They do this by issuing loans in the name of a Native American tribal business entity or entities that purport to be shielded from state and federal law via tribal sovereign immunity. In reality, the tribal lending entity is a mere "front" for an illegal lending scheme; all substantive aspects of the payday lending operation (*e.g.*, financial backing, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections) are performed by individuals and entities that are unaffiliated with the Native American tribe. In exchange for "renting" its sovereign immunity to the individuals and entities running the payday lending scheme, the cooperating Native American tribe receives an insignificant fraction of the revenues generated.

30.     However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

31.     To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

32.     These so-called "tribal lenders" usually do not survive scrutiny when examined closely, as the operations of the lender are conducted off tribal land, by non-tribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

33.     Sovereign immunity, even if correctly invoked, does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff*, No. 18-2282 (3d Cir. Sep. 6, 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful.").

### Origins of LDF Holdings and Tribal Payday Loan Operations

34.     In 2008, the LDF Tribe issued $50 million in bonds and entered into a Trust Indenture to refinance and consolidate debts associated with the Lake of the Torches Casino Facility, and to build a riverboat casino, hotel and Bed & Breakfast. *Wells Fargo Bank N.A. v. Lake of the Torches Econ. Dev. Corp.* 677 F. Supp. 1056, 1057 (E.D. Wis. 2010).

35.     The project was "plagued with problems since it began" and never generated the income needed to pay the bonds. Instead, the LDF Tribe was not only unable to make the bond payments but "was forced to reduce and eliminate many programs that [were] important to the health and welfare of the tribal members." *Id.* at 1057-1058.

36.     The LDF Tribe attempted to restructure the bonds in 2009 but was unsuccessful.

37.     The LDF Tribe stopped making payments on the bond in 2009, alleging that its contract with its lender effectively created a management contract in violation of the Indian Gaming Regulation Act. *Id.* at 1059.

38.     In 2013, facing dire economic circumstances, the LDF Tribe looked for other ways to shore up its finances.

39.     In May 2013, the LDF Tribe set about establishing an internet lending operation which would offer short-term, high-interest-rate loans to consumers via the internet.

40. However, given the LDF Tribe's poor economic situation and credit history, it was unable to obtain credit from traditional sources to fund its new payday lending operations.

41. As of May 2013, the LDF Tribe had neither experience in payday lending, nor knowledge of how to underwrite, collect, or service payday loans.

42. An article published in the Tribe's newsletter, *Inwewin*, in July 2013 noted that the LDF Tribe had embarked on a **new** internet lending business. **SEE PLAINTIFF'S EXHIBIT C.**

43. The July 2013 article stated that "the [LDF Tribe] has partnered with one of the largest and most experienced lending companies." *Id.*

44. In fact, the LDF Tribe entered into agreements with several non-tribal owners of internet lending companies, including, CreditServe and MoneyLion.

45. For each of these agreements, the LDF Tribe, through its wholly owned subsidiary LDF Holdings, created an LLC, the operations of which were then turned over to its investors.

46. In no case did the LDF Tribe actually manage, control, or operate the LLCs.

47. Indeed, non-tribal individuals and entities control and manage all substantive lending functions, provide the lending capital necessary to support the operation and bear the economic risk associated with the operation of these LLCs.

48. Because the LDF Tribe, through LDF Holdings, initially created the LLCs, these companies appeared to be owned by the LDF Tribe and were thus ostensibly

privileged with sovereign immunity from various State and Federal lending laws that limit interest rates.

49.    In exchange for the use of the LDF Tribe as a purported shield from US law, the investors in these LLCs agreed to pay the Tribe a small percentage (often less than 5%) of each loan they made to a consumer.

50.    The LDF Tribe, in essence, rented out its name, allowing others to conduct business under it.

51.    Brent McFarland, the LDF Tribe's director of business development, told the Milwaukee Journal Sentinel that "we're looking for ways to leverage [the tribe's] sovereignty" for profit. Cary Spivak, *Lac du Flambeau Chippewa enter payday loan business with eye to online gambling*, Milwaukee Journal Sentinel, Dec. 29, 2013, http://archive.jsonline.com/business/lac-du-flambeau-chippewa-enter-payday-loan-business-with-eye-to-online-gambling-b99164952z1- 237906421.html.

52.    The LDF Tribe's internet lending operations were intended to lend money to consumers at astronomically high interest rates.

### LDF Tribe Makes Myriad Deals To Rent Its Sovereign Immunity

53.    Within a short period of time, the LDF Tribe became one of the most prolific purveyors in the rental market for sovereign immunity, making "rent-a-tribe" agreements with **over 50 different non-tribal investors**, both domestic and international – many of whom have their own history of questionable business practices.

54.    In addition to Defendants, Niizhwaaswi, Midaaswi, and Ishwaaswi, the LDF Tribe claims to own Ningodwaaswi, LLC ("**Ningodwaaswi**"), which does business

as **Sky Trail Cash** and operates the payday loan website skytrailcash.com. Ningodwaaswi means "six" in Ojibwe.

55.     In reality, Sky Trail Cash is owned by Texas payday loan magnate William C. "Cheney" Pruett ("**Pruett**"), who public records show owns the barely disguised SkyTrail Servicing Group, LLC, in Texarkana, Texas. Nearly operating out in the open, Sky Trail Cash reports tradeline data on its loans to FactorTrust, Inc. ("**FactorTrust**"), a nationwide *Consumer Credit Reporting Agency* ("**CRA**"), under its own name and address in Texas.

56.     Domain Name Registration records from November 13, 2012, show that skytrailcash.com is registered to John Humphrey, My Cash Center, LLC, 1614 Hampton Rd., Texarkana, TX 75501, phone (903) 794-0013; registration records were moved to Domains By Proxy, LLC around August 19, 2013. John Humphrey works for Pruett, and Pruett owns My Cash Center, LLC.

57.     The LDF Tribe also claims to own **Niswi, LLC** ("**Niswi**"), which, until recently, did business as **Amplify Funding** and operated the payday loan website amplifyfunding.com; Amplify Funding re-branded as LendUMo in early 2020 and now operates the payday loan website lendumo.com.

58.     LendUMo is beneficially owned by Andrew Dunn ("**Dunn**"), through his companies Soaren Management, LLC, now Pinnacle Acquisitions, and Kraken Holdings, LLC, both of which utilize a Phoenix, Arizona, address for their primary business address.

59.     Like Pruett, Dunn takes little care to obfuscate his beneficial ownership of Niswi and reports tradeline data to FactorTrust under Niswi's name but with Soaren's email address, phone number, and Phoenix, Arizona, business address.

60.     In sum, despite supposedly owning a multitude of different payday loan websites, transacting tens of millions of dollars in total revenues per month, a feat which would require hundreds, if not thousands, of employees in aggregate, each and every payday lending website purportedly owned by the LDF Tribe states its business office to be at the same location: 597 Peace Pipe Rd., 2nd Floor, Lac Du Flambeau, WI 54538.

### Loan At Last is Owned by Welch

61.     As aforementioned, LDF Holdings claims to own **Niizhwaaswi,** which does business as **Loan At Last** and operates the payday loan website loanatlast.com.

62.     However, Welch and Creditserve are the true beneficial owners of Niizhwaaswi.

63.     Around January 2015, Welch purchased the domain name loanatlast.com from HugeDomains.com, an online broker and re-seller of existing web domain names.

64.     Archived *Whois* information – domain name registration data provided by owners of web domains, which identifies the owner and their contact information – shows that on January 15, 2015, the phone number for the registered owner, administrative contact, and technical contact for loanatlast.com was (323) 956-8336, a Los Angeles phone number used by Welch. **SEE PLAINTIFF'S EXHIBIT D.**

65.     Records from January 21, 2016, and January 2, 2018, both showed (323) 956-8336 as the *only* contact number for the domain name loanatlast.com. *Id.*

66.     The domain name registration data for loanatlast.com included an address in Hawaii which belongs to Vanover Marketing.

67.     Vanover Marketing's website, updated in 2015, indicates that Loan At Last's CEO has "worked in this industry for many years." *See* vanovermarketing.com/portfolio/loanatlast-branding/ Accessed April 30, 2020, 17:04.

68.     While Vanover's site does not name Welch directly, Welch purchased the domain name in 2015, and Welch had years of experience in the industry.

69.     Around April 27, 2018, Whois information for loanatlast.com was changed to reflect the name, address and phone number of Domains By Proxy, LLC, an anonymous proxy service which enables its clients to maintain anonymity in the Whois database; contract information for Domains By Proxy, LLC, is displayed rather than that of the true owner.

70.     On information and belief, although Welch's ownership is now obscured in the Whois database, he is the true beneficial owner of the website.

71.     Calling the main (and only) customer service phone number listed on Loan At Last's website, 844-676-8550 in August 2020 resulted in a representative answering the phone in the name of Loan At Last. When asked if the caller had reached Creditserve, the "Loan At Last" representative quickly confirmed, "yes."

## **LDF Holdings/ Niizhwaaswi Authorize Sham 'Agent' Agreement with CRAs**

72.     To successfully operate Loan At Last, Creditserve and Welch need access to detailed consumer data kept in the files of a number of consumer credit reporting agencies ("**CRAs**") which specialize in servicing the needs of the online payday loan

industry, including Clarity Services, Inc ("**Clarity**"), Factor Trust, Inc. ("**Factor Trust"**), and ChexSystems, LLC ("**ChexSystems**").

73.     Without access to the hundreds of datasets contained on each consumer by these CRAs, the detailed, computerized underwriting analytics utilized by Loan At Last would be virtually impossible to perform.

74.     Before being granted access to obtain reports by Clarity, Experian and ChexSystems, these CRAs required Loan At Last to have a subscriber account.

75.     Pursuant to the FCRA, 15 U.S.C. § 1681b, the CRAs must make a reasonable effort to verify the identity of any new subscriber and ensure that its reason and purpose for needing large amounts of consumer credit reports is legitimate.

76.     It would be unlikely a CRA would be willing to sell reports to an entity like Niizhwaaswi, since the CRAs preform extensive "due diligence" on each new potential subscriber. Part of this due diligence includes an inspection of the business' physical location, and requires the inspector to evaluate and investigate if the number of employees present is commensurate with the type of business purported to being conducted, the amount of equipment in the offices, the size and condition of the office, and other factors.

77.     It would be unlikely that Niizhwaaswi would, by itself, qualify for a subscriber account with Clarity, Experian or ChexSystems. Niizhwaaswi claims its offices are located at 597 Peace Pipe Road in Lac Du Flambeau, Wisconsin, on the second floor of a tribal cigarette store. No actual offices pertaining to consumer lending are maintained at 597 Peace Pipe Road. Any "due diligence" inspection of Niizhwaaswi's

physical location would almost certainly result in a negative recommendation by the inspector since Loan At Last does not actually operate from 597 Peace Pipe Road.

78.     Thus, as part of its "rent-a-tribe" agreement, Niizhwaaswi agreed to appoint Creditserve and Welch as their "agents" or "authorized service providers," meaning Creditserve and Welch were authorized to obtain consumer reports ostensibly *on behalf of* the Niizhwaaswi. The CRA agreements stipulate that the reports provided by the CRAs will only be used by Niizhwaaswi, and Creditserve/Welch would not use the reports themselves. In essence, Welch, through Creditserve, certified to the CRAs that he was simply playing the role of mailman: picking up and delivering documents, and nothing else.

79.     In reality, the assurances of Creditserve and Welch were meaningless and they at no point intended to honor them. The agreements were simply ways to create a paper trail to make it *appear* all parties were complying with the FCRA.

80.     The agreements were "win/win" scenarios for all parties involved:

a.  Welch and Creditserve got access to the files of the CRAs and could pull the thousands of reports monthly on consumers he needed, enabling Welch and his non-tribal investors to make, and collect on, a larger number of 700% APR consumer loans. Inspectors for Clarity, Experian and ChexSystems made their investigations of "Loan at Last" at offices operated and staffed by Creditserve.

b. LDF Holdings and the LDF Tribe profited, via Niizhwaaswi, since they receive a 2% "fee" or "commission" on loan revenues, which are primarily underwritten from CRA data.

c. The CRAs – who get paid per report – were able to send an independent inspector to offices operated and staffed by Creditserve and could document and photograph its offices, computer systems, employees, etc., resulting in a positive inspection report for the CRAs to have in their files, should any legal or regulatory issues ever arise. This contrasts to the alternative of having an inspector visit a rural tribal cigarette store with offices or employees present devoted to consumer lending. This would almost certainly cause the inspector's report to recommend the applicant subscriber *not* be considered verifiable, resulting in significant lost revenue for the CRAs.

81. Niizhwaaswi is thus complicit in, and profits from, the façade that Niizhwaaswi is the genuine end user of the reports obtained from the CRAs.

82. However, Creditserve and Welch were the real end users of the reports; Niizhwaaswi had no use for CBRs on any consumers since it has no actual involvement in consumer lending.

83. Creditserve and Welch pay the invoices from Clarity, Experian and ChexSystems each month for all reports sold "to" Loan at Last.

84.     Tradeline data – e.g., consumer payment data on loans made by Loan at Last – is reported to Clarity and ChexSystems by Creditserve and/or entities under the direct control and ownership of Welch.

## How Loan at Last Underwriting is Performed

85.     Once obtained, data in the CBRs is analyzed by software produced by outside, non-tribal vendors. The vendors' sophisticated algorithms crunch the CRAs data and assign a proprietary risk score to the applicant. Creditserve and Welch unilaterally determine the minimum qualifying score for a loan approval, the interest rate, repayment terms, and all other meaningful aspects of the loan. Niizhwaaswi has no say in these matters.

86.     If a consumer is approved and elects to take out a loan, the completed loan documents and details are transmitted to a representative of Niizhwaaswi, who *may* be physically located in Lac du Flambeau. The representative then electronically "reviews" the documents and provides "final approval" to the loan while, supposedly, on the LDF Tribe's soil. While the Niizhwaaswi representative is technically empowered to reject the preordained outcome of approval and deny the loan, this rarely, if ever, happens.

87.     After the *pro forma* review by Niizhwaaswi, the loan is funded with money under the express and direct control of Creditserve, Welch, and his non-tribal investors. Niizhwaaswi has no access to the bank accounts containing the working capital used to fund Loan At Last loans. Welch then pays roughly 2% of the loan revenues to Niizhwaaswi.

88.     However, because of the rubber-stamp approval occurring "on" the LDF Tribe's reservation, Niizhwaaswi, Creditserve and Welch claim the Loan At Last loans are "made" on the LDF reservation and subject exclusively to LDF tribal law.

**Creditserve and Welch Obtain Credit Report Under False Pretenses**

89.     Between September 24, 2018 and May 4, 2019, Creditserve and Welch, as agents or authorized service providers for Loan At Last/Niizhwaaswi, requested and obtained a total of nine *Credit Bureau Reports* ("**CBRs**") regarding Ms. Cromoty from Clarity, a Clearwater, Florida based CRA.

90.     Plaintiff discovered these inquires upon receipt of her consumer disclosure from Experian on April 27, 2020.

91.     Creditserve and Welch also requested and obtained nine CBRs from Experian. A record of the inquiries was logged by Experian. **SEE PLAINTIFF'S EXHIBIT E.**

92.     On January 10, 2019, Creditserve and Welch, as agents or authorized service providers for Loan At Last/ Niizhwaaswi, also obtained a CBR from ChexSystems regarding Ms. Cromoty. **SEE PLAINTIFF'S EXHIBIT F.**

93.     Clarity and ChexSystems recorded these requests for Ms. Cromoty's CBR as "hard" inquiries, *i.e.*, an inquiry which becomes part of the consumer's credit report, is included in reports provided to other lenders about the consumer, and which is factored into the consumer's credit score.

94.     Taken at face value, it would appear as if the inquiries were made by Niizhwaaswi d/b/a Loan At Last.

95.    The ChexSystems inquiry bears the address of the LDF Tribe's smoke shop in Lau du Flambeau, Wisconsin. **SEE PLAINTIFF'S EXHIBIT F.**

96.    However, in reality, the inquires were made by Creditserve, through policies and procedures implemented, authorized, designed, and facilitated by Welch at offices far from Wisconsin.

97.    Niizhwaaswi previously signed and submitted blanket certifications of permissible purpose to Clarity, Experian, and ChexSystems, falsely declaring that Creditserve and Welch, their "service providers" or "agents," needed reports to evaluate consumers for loans they had *already applied for*.

98.    Niizhwaaswi were fully aware that in many, if not most, instances, credit reports would be obtained prior to any potential permissible purpose existing, since only a small fraction of Loan At Last's web traffic comes organically.

99.    The lion's share of Loan At Last's customers only become aware of Loan At Last after direct solicitation by Loan At Last – solicitations only made to consumers who fit Loan At Last's underwriting criteria, as ascertained by sophisticated analysis of the detailed credit reports provided by Clarity, Experian and ChexSystems.

100.    Pursuant to the FCRA, 15 U.S.C. § 1681b(f), any person requesting a CBR must have a permissible purpose for obtaining it. Any such person requesting a report must also certify who is requesting the report.

101.    Welch and Creditserve, as agents or service providers for Niizhwaaswi, certified to Clarity, Experian and ChexSystems they had a permissible purpose to obtain

the reports because Ms. Cromoty had *already initiated* a request for credit or some other business transaction directly with Loan At Last.

102.    Welch and Creditserve, as agents or service providers for Niizhwaaswi, certified to Clarity, Experian and ChexSystems that the end user requesting the CBRs was Niizhwaaswi.

103.    Thus, Welch and Creditserve obtained Ms. Cromoty's CBRs under false pretenses: by falsely certifying Niizhwaaswi was the end user of the report.

104.    The CBRs were actually used by Creditserve, Welch, and his investors and non-tribal contractors hundreds of miles away.

105.    Moreover, Ms. Cromoty did not apply for a loan or to transact business with Creditserve, or Niizhwaaswi, nor did she consent to any credit report(s) being obtained regarding her by "Loan At Last" or any related entity.

106.    Ms. Cromoty made no such direct inquiry with Loan At Last. Rather, Welch and Creditserve obtained Ms. Cromoty's basic personal information, including her purported address, employer, bank account number, etc. from an online payday loan lead generator.

107.    Many of these lead generators use misleading and false statements to hoodwink unsuspecting consumers into providing personal information about themselves.

108.    These lead generators then re-sell the information to illegally-operating payday lenders like Loan At Last, who then seek to qualify their new "leads" by obtaining highly detailed credit reports on the consumer's spending and financial

behavior from sources like Clarity, Experian and ChexSystems, as well as other similar CRAs like Factor Trust and DataX.

109.    The Consumer Financial Protection Bureau ("CFPB") has brought complaints against, and settle claims with, a number of "lead generators" who it alleged duped consumers into providing personal information about themselves, then re-sold these leads to online payday lenders it knew were operating illegally. *See e.g. In the Matter of Zero Parallel,* 2017-CFPB-0017

110.    Once located, the qualified consumer is almost literally bombarded with a flood of advertising emails, text messages, automated sales phone calls, and more, playing up the "quick" and "easy" loan terms offered, with no mention of the true cost of the loan.

111.    Creditserve and Welch rely on shadowy data brokers/lead generators to obtain the vast majority of their leads, for whom they pull detailed credit reports on, and then market their services heavily to, provided the consumer's data fits the profile developed by Loan At Last's non-tribal, *de facto* owners, who supply the capital to make loans, and strictly control the underwriting process.

### **Defendants are Subject to Jurisdiction of Florida Court**

112.    Welch and Creditserve were aware they were requesting reports from Clarity, a CRA based in Clearwater, Florida, as well as ChexSystems, a CRA based in Jacksonville, Florida.

113.    Welch and Creditserve were aware they were requesting reports on a specific individual, Ms. Cromoty, who resides in Florida.

114.    Thus, at all times relevant, Welch and Creditserve were conducting extensive business activities in the State of Florida, with its two main data sources of consumer reports both being within the State.

115.    Welch and Creditserve, as "Loan At Last," frequently lend money to consumers in Florida, and wire money to Florida consumers at banks located in Florida, and then enact electronic debits of those same Florida accounts.

116.    At all times relevant, Welch and Creditserve operated an interactive website, www.LoanAtLast.com, that was frequently accessed by consumers in Florida relating to its payday loans. Indeed, one of the web pages of LoanAtLast.com, loanatlast.com/bad-credit-loans-florida/, repeatedly references the availability of Loan At Last loans in Florida, stating in part, "applying for an installment loan (with Loan At Last) in Florida is a simple task."

117.    Operation of an interactive website like LoanAtLast.com is a factor which tends to establish personal jurisdiction over a defendant in the forum state. *Toys "R" Us, Inc., v. Step Two*, 318 F.3d 446, 454 (3rd Cir. 2003).

118.    The conduct complained of by Ms. Cromoty – the procurement of her credit reports containing detailed, sensitive personal information – was done within Florida.

119.    Niizhwaaswi was compensated by Welch and Creditserve for their complicity and authorization allowing CBRs to be pulled in their name.

120.    Niizhwaaswi knowingly appointed Welch and Creditserve as its agents and signed documents with the CRAs agreeing to ensure Welch and Creditserve complied with the FCRA.

121.    When Welch and Creditserve obtained reports on Ms. Cromoty in contravention to the FCRA, Welch and Creditserve were acting as agents for Niizhwaaswi, under the direction of Niizhwaaswi, and within the scope of authority provided by Niizhwaaswi.

122.    As such, Niizhwaaswi is jointly and severally liable under the FCRA.

### **National Small Loan Operates Under a Similar Rent-A-Tribe Scheme**

123.    National Small Loan is another online payday website supposedly owned and operated by LDF Holdings, through Midaaswi, a purportedly tribal limited liability company.

124.    Like Loan At Last, National Small Loan makes loans at 700% annual interest rates and is operated by, and primarily benefits, non-tribal persons.

125.    Around November 18, 2013, the website nationalsmallloan.com was registered to Melissa Drotar, 7257 NW 4th Blvd. #7, Gainesville, FL 32607, email melissa@nationalpayday.com. **SEE PLANITIFF'S EXHIBIT G.**

126.    Nationalpayday.com was supposedly owned by Devidia II Ldta, which *claimed* to be located in Costa Rica.

127.    In reality, the business was beneficially owned by Aaron Taravella ("**Taravella**"), Oscar Rodriguez ("**Rodriguez**"), Jesus Diaz ("**Diaz**"), and other, non-Costa Rican investors.

128.    The address 7257 NW 4ᵗʰ Blvd.., #7, Gainesville, FL 32607 belongs to Westside Postal Express, a company that provides private post office boxes.

129.    National Pay Day actually operated out of an office at **4911 SW 91ˢᵗ Terrace, Suite A, Gainesville, FL 32608.** This is the same address used by Taravella for his business, Strategic Funding Partners, Inc. **SEE PLAINTIFF'S EXHIBIT H.**

130.    At one point, Strategic Funding Partners, Inc., did business as "Gainesville Title Loan."

131.    National Small Loan made payday loans from its website at rates exceeding 700% annually. Archived web pages from January 2015 show no indication that the website, at that time, claimed any kind of affiliation with a Native American tribe.

132.     In January 2015, National Small Loan's logo featured a blue-and-black stack of cash to the left, with the word "National" on one line and "SmallLoan.com" on a second:



**SEE PLAINTIFF'S EXHIBIT I.**

133.    Web archives from 2015 show its business hours to be listed as 9am to 5pm Eastern Standard Time.  Not coincidentally, Gainesville, Florida, is in the **Eastern Time Zone**. *Id.*

134.     Web archives from 2014 and 2015 show NationalSmallLoan.com made no mention of any "tribal" affiliation. The main customer service number was 877-778-8006 and its fax number 866-513-0374. *Id.*

135.     The identical phone and fax numbers can be found on the website of Nationalpayday.com **SEE PLAINTIFF'S EXHIBIT J.**

136.     In June 2015, the State of Washington, Department of Financial Institutions, Division of Consumer Services, fined Devidia II Ltda $4,750 for making illegal, unlicensed loans in Washington State, and ordered it to cease and desist.

137.     Shortly thereafter, National Small Loan relocated to rural Wisconsin and began claiming it was "owned" by the LDF Tribe and operated from the second floor of a cigarette store called the Smoke Shop at 597 Peace Pipe Road, Lac du Flambeau, WI 54538.

138.     After its "acquisition" by the LDF Tribe, money flowed in – and out – of National Small Loan through a maze of different shell companies, including Unified Analytics, LLC ("**Unified Analytics**"), and National Techmark, Inc. ("**National Techmark**"). Both of these companies operated from 4911 SW 91st Terrace, Suite A, in Gainesville and were owned by Taravella's long-time associates, Rodriguez and Diaz.

139.     Even though National Small Loan now claims to be located in Wisconsin, which is in the Central Time Zone, its website indicates hours of operation in Eastern Standard Time. Its logo also remains the same:



140.    The fax number 866-513-0374 is still used by **both** the "tribal" National Small Loan and non-tribal National PayDay as of August 2020.

141.    Unified Analytics and National Techmark received more than $5 million from Ganador Enterprises, LLC, and Carl Ruderman ("**Ruderman**").

142.    Unified Analytics and National Techmark used this money to fund "tribal" payday loans, allegedly issued by Midaaswi and National Small Loan.

143.    As with Loan At Last, the beneficial, non-tribal owners of National Small Loan became agents or authorized service providers for Midaaswi with respect to Clarity and Experian, with the knowledge, consent and direct participation of Midaaswi.

144.    Once again, everyone got what they wanted: the non-tribal owners of National Small Loan got access to the CBRs they need to underwrite loans, Midaaswi collected more 2% commissions on loan revenue, and the CRAs were able to send inspectors to real offices staffed with real lending employees – likely under the control of Taravella – rather then send inspectors to the vacant offices on the second floor of a cigarette shop in Wisconsin with no discernable activity relating to lending.

145.    Should any state or federal regulatory authority investigate the matter, everyone's "rear end" was covered. The CRAs could produce substantial documentation showing they had, indeed, verified their customer extensively. The non-tribal owners of

National Small Loan could simply claim they were, as the agreements clearly state, mere "agents" performing a service for the less-technically-inclined Midaaswi, and Midaaswi could simply stonewall any investigation by crying sovereign immunity.

146.    Loan underwriting followed the same, well-worn patterns as before: loan approval was made by the non-tribal owners of National Small Loan. Electronic documents were transmitted to an Midaaswi representative on LDF tribal soil in Wisconsin, who makes *pro forma* reviews and "approves" the loan while technically on the LDF reservation. The loans then teleport off the LDF reservation and are funded from bank accounts which Midaaswi has no access to. The loans are serviced and collected by non-tribal entities off the LDF Tribe's reservation.

### National Small Loan Obtains CBR Without Permissible Purpose

147.    On April 17, 2019, National Small Loan obtained a CBR regarding Ms. Cromoty from Clarity, as well as from Experian, who recorded a record of the inquiry. **SEE PLAINTIFF'S EXHIBIT F.**

148.    Clarity recorded the inquiry as a hard inquiry.

149.    The beneficial, non-tribal owners of National Small Loan, with the aid, knowledge and consent of Midaaswi, obtained the CBR under false pretenses and without permissible purpose.

150.    The beneficial, non-tribal owners of National Small Loan claimed that Midaaswi was the actual end user of the report, although it had no use for the report as it was not involved in any meaningful way concerning loan underwriting.

151.   As with Loan At Last's inquiry, Ms. Cromoty's personal information was purchased from an online lead generator, who itself had no consent to obtain any CBR regarding Ms. Cromoty.

152.   At the time of the inquiry, Ms. Cromoty had no open account with National Small Loan, and had not applied for credit with National Small Loan.

153.   However, Midaaswi was compensated by the beneficial, non-tribal owners of National Small Loan for its complicity and authorization allowing CBRs to be pulled in its name.

154.   Midaaswi appointed the beneficial, non-tribal owners of National Small Loan as their agents, and at all times relevant, the beneficial, non-tribal owners of National Small Loan were acting within the scope and authority of such agency. As such, Midaaswi is liable for the impermissible pull.

## Radiant Cash Obtains Reports Without Permissible Purpose

155.   Radiant Cash is an online payday lender who lends to consumers at interest rates between 400% to 800% annually from its website, www.radiantcash.com.

156.   Radiant Cash is purportedly owned and operated by Ishwaaswi, another tribal LLC allegedly owned by LDF Holdings.

157.   However, MoneyLion is the true owner and operator of Radiantcash.com.

158.   Decisions about all key aspects of the lending business—from who to buy leads from, which credit reporting agencies credit reports are obtained from, underwriting analytics, collection methods, marketing, and even factors like which states to lend money in -- are made by MoneyLion, and not Ishwaaswi.

159.    Archived records of Domain Name Registration records show that on November 11, 2013, radiantcash.com was registered to **MoneyLion LLC**, 11 Patricia Way, Kendall Park, NJ 08824, phone (917) 971-6064, email dc@moneylion.com. **SEE PLAINTIFF'S EXHIBIT K.**

160.    The "dc" in the email address is short for Diwakar Choubey, the CEO of MoneyLion.

161.    The address 11 Patricia Way, Kendall Park, NJ 08824 is Choubey's previous home address. The phone number (917) 971-6064 is an address which belonged to him.

162.    Archives of MoneyLion's now-discontinued website, LionLoans (www.lionloans.com) show that when LionLoans was still active, it contained a contact address in the small town of Isabel, South Dakota – well of the tribal land of the LDF Tribe. **SEE PLAINTIFF'S EXHIBIT L.**

163.    A listing with the Better Business Bureau ("BBB") for MoneyLion also indicates an address in South Dakota. **SEE PLAINTIFF'S EXHIBIT M.**

164.    Radiant Cash's web server's IP address is 54.84.7.44, which corresponds to a physical location in Ashburn, Virginia, more than 1,000 miles from the LDF Tribe's reservation. **SEE PLAINTIFF'S EXHIBIT N.**

165.    Radiant Cash's loan underwriting follows the same template as the dozens of other LDF-affiliated payday lending websites: loan approval is made by MoneyLion, a well-funded, fintech start-up with considerable expertise in small-dollar, high-interest-rate borrowing. Electronic documents are transmitted to an Ishwaaswi representative on

LDF tribal soil in Wisconsin, who makes *pro forma* reviews and "approves" the loan while technically on the LDF reservation. Afterward, the loans zip back to Utah, where one of MoneyLion's main offices is located, and are funded from bank accounts controlled by MoneyLion and which Ishwaaswi has no access to. The loans are serviced and collected by MoneyLion's employees and contractors, off the LDF Tribe's reservation.

166.    MoneyLion, with the knowledge, aid, and complicity of Ishwaaswi, became an agent or authorized service provider for Ishwaaswi/Radiant Cash from Clarity and Experian, as well as other similar CRAs.

167.    Yet again, such arrangement allowed for the coverings of multiple *derrieres* – to wit, those of MoneyLion, Experian, Clarity, LDF Holdings and Ishwaaswi. Now, more "tribal" payday loans could be issued, with everyone sharing the profits (although some substantially more than others), although at the expense of consumers.

168.    On three separate occasions between January 26, 2019 and May 3, 2019 MoneyLion, as agent or service provider for Ishwaaswi, obtained Ms. Cromoty's CBRs from Clarity and from Experian.

169.    A record of these inquiries was recorded by Experian. **SEE PLAINTIFF'S EXHIBIT F.**

170.    MoneyLion, as agent or service provider for Ishwaaswi, also obtained a CBR from ChexSystems regarding Ms. Cromoty on January 26, 2019. **SEE PLAINTIFF'S EXHIBIT G.**

171.    Ms. Cromoty applied for no credit with MoneyLion, Ishwaaswi, Radiant Cash, or any related entity. Rather, MoneyLion purchased Ms. Cromoty's personal information from an online lead generator.

172.    MoneyLion, with the aid, knowledge and consent of Midaaswi, obtained the CBRs under false pretenses and without permissible purpose.

173.    MoneyLion claimed Ishwaaswi was the actual end user of the report, although it had no use for the report as it was not involved in any meaningful way concerning loan underwriting. As in previous examples, Ms. Cromoty's personal information was purchased from an online lead generator.

174.    However, Ishwaaswi was compensated by MoneyLion for its complicity and authorization allowing CBRs to be pulled in their name.

175.    MoneyLion was an agent for Ishwaaswi and was acting within the scope of its agency and under the control of Ishwaaswi.

176.    As such, Ishwaaswi is jointly and severally liable under the FCRA.

177.    Ms. Cromoty has hired the aforementioned law firm to represent her in this matter and has assigned his right to fees and costs to such firm.

## COUNT I
## VIOLATIONS OF THE FCRA – *Midaaswi*

178.    Ms. Cromoty incorporates Paragraphs 1 – 177 as if fully restated herein.

179.    Midaaswi violated **15 U.S.C. § 1681b(f)** when it knowingly authorized, condoned, facilitated and participated with the beneficial owners of National Small Loan in obtaining CBRs from Clarity and Experian without any permissible purpose.

180.    The beneficial owners of National Small Loan, as agents for Midaaswi, falsely certified to Experian and Clarity that the requests for Ms. Cromoty's CBRs were in connection with an alleged *credit transaction* between Ms. Cromoty and National Small Loan, when Ms. Cromoty had no business or loan with National Small Loan.

181.    Assuming, *arguendo,* that Ms. Cromoty had applied for a loan with National Small Loan, such loan would have been *void ab initio* due to Florida's usury laws, and Midaaswi still would not have permissible purpose to obtain a CBR.

182.    Assuming, *arguendo,* that Ms. Cromoty had applied for a loan with National Small Loan, Midaaswi and would still have violated 15 U.S.C. § 1681b(f) as this section prohibits obtaining a consumer report for any purpose unless it is obtained for a purpose for which the report is authorized and the purpose has been certified by the prospective user, since it was not obtaining the information in response to any actual request by Ms. Cromoty but rather for pre-screening or marketing purposes, to simply ascertain if Ms. Cromoty would be a good "lead" to market usurious loans to.

183.    Midaaswi is thus jointly and severally liable for the above-stated violations, as it is liable for the acts of its agent/authorized service provider, acting within the scope and authority of the agency granted to it by Midaaswi.

184.    As a result of their conduct, Midaaswi is liable to Ms. Cromoty pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Ms. Cromoty respectfully requests this Honorable Court to enter judgment against Midaaswi for:

a.   The greater of statutory damages of **$1,000.00** per incident  pursuant (for a total of **$2,000**) to 15 U.S.C. § 1681n(a)(1)(A) or Ms. Cromoty's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.   Punitive damages for intentional violation of the Act, pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c.   Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

d.   Such other relief that this Court deems just and proper.

## COUNT II
## VIOLATIONS OF THE FCRA – *Ishwaaswi & MoneyLion*

185.   Ms. Cromoty incorporates Paragraphs 1 – 177 as if fully restated herein.

186.   Ishwaaswi and MoneyLion violated **15 U.S.C. § 1681b(f)** when MoneyLion obtained three CBRs each from Clarity and Experian, and one from ChexSystems, regarding Ms. Cromoty, without any permissible purpose.

187.   Ishwaaswi knowingly authorized, condoned, and facilitated a scheme pursuant to which MoneyLion certified to Experian, Clarity and ChexSystems that the requests for Ms. Cromoty's CBRs were on behalf of the "end user" Ishwaaswi, and were in connection with an alleged *credit transaction* between Ms. Cromoty and Radiant Cash, when Ms. Cromoty had no business or loan with Radiant Cash and MoneyLion was the true end user of the reports.

188.    Ishwaaswi and MoneyLion were aware that Ms. Cromoty's information had been purchased from a lead generator and that no permissible purpose to obtain CBRs existed.

189.    Ishwaaswi and Money Lion further violated **15 U.S.C. § 1681b(f)** when MoneyLion, as agents or authorized service provider for Ishwaaswi, knowingly obtained Ms. Cromoty's CBRs under false pretenses, claiming Ishwaaswi was the true end user of the report, when MoneyLion was.

190.    Ishwaaswi allowed MoneyLion to request reports from CRAs knowing MoneyLion would provide false certifications that Ishwaaswi was the end user of the reports.

191.    Ishwaaswi aided and facilitated this by signing blanket certifications to the CRAs it was the legitimate end user of the reports and that it would strictly monitor and ensure compliance with the FCRA by its agents or service providers, MoneyLion.

192.    Thus, pursuant to agreements signed by Ishwaaswi, MoneyLion was an agent for Ishwaaswi, and was acting within the scope of its authority.

193.    As such, Ishwaaswi is jointly and severally liable for the impermissible credit pulls.

194.    Even assuming, *arguendo,* that Ms. Cromoty had applied for a loan with Radiant Cash, such loan would have been *void ab initio* due to Florida's usury laws, and Ishwaaswi and Money Lion still would not have permissible purpose to obtain CBRs.

195.    Assuming further, *arguendo,* that Ms. Cromoty had applied for a loan with Radiant Cash, Ishwaaswi and Money Lion would still have violated 15 U.S.C. §

1681b(f), as this section prohibits obtaining a consumer report for any purpose unless it is obtained for a purpose for which the report is authorized and the purpose has been certified by the prospective user.

196.    Ishwaaswi and Money Lion were not obtaining the information in response to any actual request by Ms. Cromoty, but rather for pre-screening or marketing purposes, to simply ascertain if Ms. Cromoty would be a good "lead" to market usurious loans to.

197.    As a result of their conduct, Ishwaaswi and Money Lion are liable to Ms. Cromoty pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Ms. Cromoty respectfully requests this Honorable Court to enter judgment against Ishwaaswi and Money Lion, jointly and severally, for:

a.    The greater of statutory damages of **$1,000.00** per incident (for a total of **$7,000.00**) pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Ms. Cromoty's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.    Punitive damages for intentional violation of the Act, pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

d.    Such other relief that this Court deems just and proper.

## COUNT III
## VIOLATIONS OF THE FCRA –
### *Niizhwaaswi, Creditserve, & Welch*

198.    Ms. Cromoty incorporates Paragraphs 1 – 177 as if fully restated herein.

199.    Niizhwaaswi, Welch, and Creditserve violated **15 U.S.C. § 1681b(f)** when Creditserve and Welch obtained one CBR from ChexSystems, five CBRs from Experian, and five CBRs from Clarity, for a total of 11 CBRs, all regarding Ms. Cromoty and all without any permissible purpose.

200.    Niizhwaaswi knowingly authorized, condoned, and facilitated a scheme pursuant to which Creditserve and Welch falsely certified to Experian, Clarity and ChexSystems that the requests for Ms. Cromotoy's CBRs were on behalf of the "end user" Niizhwaaswi and were in connection with an alleged *credit transaction* between Ms. Cromoty and Loan At Last, when Ms. Cromoty had no business or loan with Loan At Last.

201.    Niizhwaaswi, Welch, and Creditserve were all aware that Ms. Cromoty's information had been purchased from a lead generator and that no permissible purpose to obtain a CBR existed.

202.    Niizhwaaswi, Welch, and Creditserve violated **15 U.S.C. § 1681b(f)** when Niizhwaaswi and Welch, as agents or authorized service providers for Niizhwaaswi, knowingly obtained Ms. Cromoty's CBR under false pretenses, claiming Niizhwaaswi was the true end user of the report, when Creditserve and Welch were.

203.     Niizhwaaswi allowed Creditserve and Welch to request reports from CRAs knowing false certifications that Niizhwaaswi was the end user of the report would be provided.

204.     Niizhwaaswi aided and facilitated this by signing blanket certifications to the CRAs it was the legitimate end user of the reports and that it would strictly monitor and ensure compliance with the FCRA by its agents or service providers, Creditserve and Welch.

205.     Thus, pursuant to agreements signed by Niizhwaaswi, Creditserve and Welch were agents for Niizhwaaswi and were acting within the scope of their agency and, according to the agreements, were under the direction and control of Niizhwaaswi.

206.     As such, Niizhwaaswi is jointly and severally liable for the actions of Creditserve and Welch.

207.     Assuming, *arguendo,* that Ms. Cromoty had applied for a loan with Loan At Last, such loan would have been *void ab initio* due to Florida's usury laws, and Niizhwaaswi, Creditserve and Welch still would not have permissible purpose to obtain a CBR.

208.     Further assuming, *arguendo,* that Ms. Cromoty had applied for a loan with Loan At Last, Niizhwaaswi, Creditserve and Welch would still have violated 15 U.S.C. § 1681b(f), as this section prohibits obtaining a consumer report for any purpose unless it is obtained for a purpose for which the report is authorized and the purpose has been certified by the prospective user, and Niizhwaaswi, Creditserve and Welch were not obtaining the information in response to any actual request by Ms. Cromoty but rather for

pre-screening or marketing purposes, to simply ascertain if Ms. Cromoty would be a good "lead" to market usurious loans to.

209.    As a result of their conduct, Niizhwaaswi, Creditserve and Welch are liable to Ms. Cromoty pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Ms. Cromoty respectfully requests this Honorable Court to enter judgment against Niizhwaaswi, Creditserve and Welch, jointly and severally, for:

a.    The greater of statutory damages of **$1,000.00** per incident (for a total of **$11,000.00**) pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Ms. Cromoty's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.    Punitive damages for intentional violation of the Act, pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

d.    Such other relief that this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Ms. Cromoty hereby demands a jury trial on all issues so triable.


Respectfully submitted on October 12, 2020, by:

**SERAPH LEGAL, P. A.**

/s/ *Bryan J. Geiger*
Bryan J. Geiger, Esq.
Florida Bar No.: 119168
BGeiger@seraphlegal.com
2002 E. 5th Avenue, Suite 104
Tampa, FL 33605
Tel: 813-567-1230
Fax: 855-500-0705
*Attorneys for Plaintiff*

## EXHIBIT LIST

A.    Screenshot of NationalSmallLoan.com, Taken October 6, 2020
B.    Screenshot of RadiantCash.com, Taken October 6, 2020
C.    July 2013 Inwewin Article
D.    Loan At Last Domain Registration Records
E.    Plaintiff's Experian Consumer Disclosure, Inquiry Excerpt
F.    Plaintiff's FactorTrust Consumer Disclosure, Inquiry Excerpt
G.    NationalSmallLoan.com Domain Registration Records
H.    Excerpt from Application of Strategic Funding Partners to Transact Business in Florida
I.    Web Archives of NationalSmallLoan.com
J.    Screenshot of NationalPayDay.com
K.    Domain Registration Records for RadiantCash.com
L.    Archived Webpage for Lionloans.com
M.    BBB Webpage Showing MoneyLion Address
N.    Radiant Cash's IP Address Server Location